STURR v. BECK.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF DAKOTA.

No. 1172. Submitted December 9, 1889. — Decided March 3, 1890.

No judgment or decree of the highest court of a Territory can be reviewed in this court in matter of fact, but only in matter of law.

The filing of a homestead entry of a tract across which a stream of water runs in its natural channel with no right or claim of right to divert it therefrom; confers a right to have the stream continue to run in that channel, without diversion; which right, when completed by full com-

pliance with the requirements of the statutes on the part of the settler, and the issue of a patent, relates back to the date of the filing, and cuts off intervening adverse claims to the water.

The legislation of Congress upon this subject reviewed.

THIS suit was commenced by Daniel Sturr against Charles W. Beck by a complaint filed in a district court of the Territory of Dakota, seeking an injunction against the defendant from interfering with an alleged water right and ditch of the complainant and the use of the water of a certain creek through the same, and for damages alleged to have been sustained by interference which had already taken place. The allegations of the complaint were denied in the answer of the defendant, so far as inconsistent with its statements; and the facts in regard to the matters set up in the complaint were averred by the defendant as he claimed them to be, with a prayer for an injunction against the complainant from trespassing upon his land and diverting the water of the creek, and from keeping and maintaining the ditch on his land, and for damages and costs. The cause was tried by the court upon an agreed statement of facts, it being stipulated that the court might make its findings of fact and conclusions of law on such agreed statement with the same effect as if the facts therein contained had been proven in court. The court thereupon proceeded to make its findings of fact and conclusions of law as follows:

*"Findings of Fact.*

" 1st. That the plaintiff, Daniel Sturr, made a homestead filing or entry of the S. E. ¼ N. W. ¼, E. ½ S. E ¼, and S. W. ¼ S. E. ¼ of sec. 35, town. 7 N., of range 3 E., B. H. M., on the 15th day of May, 1880, and thereafter at the United States land office at Deadwood, D. T., made final proof or entry thereof on the 10th day of May, 1883, having settled thereon in June, 1877, and he has resided thereon continuously ever since, cultivating at least seventy acres thereof, and has received a patent for said land from the United States.

" 2d. That one John Smith made a homestead filing or entry of the W. ½ S. E. ¼, S. W. ¼ N. E. ¼, and lot 2 of sec. 2,

town. 6 N., of range 3 E., B. H. M., on the 25th day of March, 1879, and thereafter at the United States land office at Deadwood, D. T., made final proof or entry thereof on the 10th day of May, 1883, having settled thereon in March, 1877, and resided thereon until he sold the same to defendant Beck, in May, 1884, and has received a patent for said land from the United States.

"3d. That on or about the 15th day of May, 1880, the plaintiff, Daniel Sturr, without any grant from John Smith, the occupant and claimant, as above stated, went upon the homestead claim of John Smith, above described, and located a water right on said Smith's homestead, claiming the right to divert 500 inches, miner's measurement, of the waters of False Bottom Creek then and long prior thereto flowing over and across said land in its natural channel, and to carry the same by means of a ditch to and upon his own homestead claim, immediately adjacent.

"4th. That said plaintiff posted a written notice at the point of said proposed diversion, claiming the right to divert said water, and caused a copy of the same to be filed in the office of the register of deeds in and for Lawrence County, Dakota, on the 9th day of May, 1881, and the same was recorded in Book 14, page 468, of the records of said county.

"5th. That immediately thereafter the plaintiff constructed a ditch from the point of such diversion across the John Smith homestead and diverted and conveyed not less than 300 inches of the waters of said False Bottom Creek to and upon his said land adjacent, and there used the same for irrigating his crops growing thereon whenever the same was necessary, until interfered with by the defendant, in the summer of 1886.

"6th. That on May first, 1884, John Smith conveyed his said homestead to the defendant, Charles W. Beck, by warranty deed purporting to convey the fee without any reservation; whereupon the plaintiff entered into the possession thereof and has so remained ever since.

"7th. That in the spring of 1886 the defendant Beck notified the plaintiff Sturr to cease diverting the waters of False Bottom Creek from their natural channel upon defendant's

said land, and forbade him maintaining his said ditch upon defendant's said land for that purpose.

"8th. That the custom existing and which has existed in Lawrence County ever since its settlement recognizes and acknowledges the right to locate water rights and to divert, appropriate and use the waters of flowing streams for purposes of irrigation when such location, diversion and use does not conflict or interfere with rights vested and accrued prior thereto.

"9th. That neither John Smith nor the defendant Beck ever made any water-right location claiming the waters of False Bottom Creek, and had not prior to the said location thereof by the plaintiff, Daniel Sturr, ever diverted the said waters from their natural channel where they had been accustomed to flow.

"10th. That said John Smith, on the second day of February, 1882, recited in the written contract of that date made with the plaintiff, Daniel Sturr, that the latter was the owner of the Elm Tree water right, which was the said water right located as aforesaid by said Sturr on the 15th day of May, 1880.

"11th. That the use of said water for irrigation is beneficial and valuable to the person or persons owning or possessing the same.

## "Conclusions of Law.

"1st. That at the time of the location of the water right made upon John Smith's homestead by the plaintiff, Daniel Sturr, in May, 1880, a prior right to have the waters of said False Bottom Creek flow in the regular channel of said creek over and across said land had vested in John Smith by virtue of his homestead filing or entry made on the 25th day of March, 1879, he having made final proof or entry thereafter.

"2d. That said vested right so acquired by said John Smith was conveyed to the defendant, Charles W. Beck, by warranty deed on May first, 1884.

"3d. That the plaintiff, Daniel Sturr, by his location and diversion of the waters of False Bottom Creek, so made by him upon the homestead of said John Smith on the 15th day

of May, 1880, acquired no right as against the defendant. Beck to divert said waters or to maintain a ditch upon defendant's land for that purpose.

"4th. That the patent issued to John Smith for the premises mentioned related back to the date of his making his homestead filing or entry of said premises on the 25th day of March, 1879.

"5th. That the plaintiff can take nothing by this action."

Judgment in favor of the defendant was entered dismissing the complaint upon the merits and awarding costs.

To the tenth finding of fact and to conclusions of law Nos. 1, 2, 3 and 4 plaintiff duly excepted, and also to the judgment and decree, and filed his motion to set aside certain of the findings of fact and conclusions of law, and to adopt others named in their places, and also for a new trial, which motions were severally overruled, and he excepted. Plaintiff thereupon prosecuted an appeal to the Supreme Court of the Territory, and assigned as error that the court erred "in its finding of fact No. 10, and in not correcting the same as requested by plaintiff in his motion to correct said finding;" in the conclusions of law Nos. 1, 2, 3 and 4 respectively; in denying the motion for a new trial; and "because the decision of the court is against law." The judgment of the District Court was affirmed by the Supreme Court, which rendered the following opinion: "The judgment of the lower court is affirmed. The court holds that the homesteader was the prior appropriator of the water right, and the plaintiff has no right to enter upon the prior possession of the defendant under his H. E. for the purpose of appropriating any portion of the running streams and creeks thereon." An appeal was then taken to this court.

*Mr. Daniel McLaughlin* and *Mr. William R. Steele* for appellant.

*Mr. R. A. Burton* for appellee.

MR. CHIEF JUSTICE FULLER, after stating the case as above, delivered the opinion of the court.

With the notice of appeal and appeal bond appellant filed his own affidavit and that of another that the ditch and water right in controversy were reasonably worth $7500. After the record was filed here a motion was made by appellee to dismiss, accompanied by several affidavits, to the effect that such value was far less than $5000. And upon this motion counter-affidavits have been presented. We have carefully examined all these papers and conclude that the motion should be overruled.

No judgment or decree of the highest court of a Territory can be reviewed by this court in matter of fact, but only in matter of law; and we are confined in this case to determining whether the court's findings of fact support the judgment. *Idaho and Oregon Land Co.* v. *Bradbury*, 132 U. S. 509; 18 Stat. 27, 28.

John Smith settled on the tract of land described in March, 1877, and continued to reside thereon until he sold and conveyed it by warranty deed to Beck, the appellee. He made his homestead filing or entry March 25, 1879, and his final proof May 10, 1883, and received a patent from the United States. The waters of False Bottom Creek flowed in its natural channel over and across Smith's homestead, and in May, 1880, Sturr, the appellant, went upon that homestead, located a water right thereon and constructed a ditch which diverted the waters of the creek to his own adjacent land. Beck went into possession under the deed from Smith, and in 1886 notified Sturr to cease diverting the water and maintaining the ditch, and this suit thereupon followed.

It is not contended on behalf of Sturr that he is entitled to maintain the ditch because he constructed and used it, or that Smith's acquiescence amounted to anything more than a revocable license. There was no grant nor an adverse enjoyment so long continued as to raise a legal presumption of a grant. But it is insisted that the doctrine of prior appropriation of water on the public land and its beneficial use protects him from interference because neither Smith nor Beck made any water-right location claiming the waters of False Bottom Creek, and had never diverted those waters prior to Sturr's location.

If, however, Smith obtained a vested right to have the creek flow in its natural channel by virtue of his homestead entry of March 25, 1879, and possession thereunder, or if his patent took effect as against Sturr by relation as of that date, then it is conceded that Sturr cannot prevail and the judgment must be affirmed.

The right of a riparian proprietor of land bordering upon a running stream to the benefit to be derived from the flow of its waters as a natural incident to, or one of the elements of, his estate, and that it cannot be lawfully diverted against his consent, is not denied; nor does the controversy relate to the just and reasonable use as between riparian proprietors. The question raised is whether Smith occupied the position of a riparian proprietor or a prior appropriator, as between himself and Sturr, when the latter undertook to locate his alleged water right. At that time Smith had been in possession for three years, and his homestead entry had been made over a year.

A claim of the homestead settler, such as Smith's, is initiated by an entry of the land, which is effected by making an application at the proper land office, filing the affidavit and paying the amounts required by sections 2238 and 2290 of the Revised Statutes. Under section 2291 the final certificate was not to be given or patent issued "until the expiration of five years from the date of such entry." But under the third section of the act of May 14, 1880, 21 Stat. 141, c. 89, § 3, providing that "any settler who has settled, or who shall hereafter settle on any of the public lands of the United States, whether surveyed or unsurveyed, with the intention of claiming the same under the homestead laws, shall be allowed the same time to file his homestead application and perfect his original entry in the United States land office as is now allowed to settlers under the preëmption laws to put their claims on record, and his right shall relate back to the date of settlement, the same as if he settled under the preëmption laws," the ruling of the Land Department has been that if the homestead settler shall fully comply with the law as to continuous residence and cultivation, the settlement defeats all

claims intervening between its date and the date of filing his homestead entry, and in making final proof his five years of residence and cultivation will commence from the date of actual settlement.

Under section 2297 of the Revised Statutes it is provided that upon change of residence or abandonment as therein mentioned, before the expiration of the five years, " then and in that event the land so entered shall revert to the government." It was held by Attorney General MacVeagh, in an opinion to the Secretary of War, July 15, 1881, that " where a homestead entry of public land has been made by a settler the land so entered cannot, while such entry stands, be set apart by the President for a military reservation, even prior to the completion of full title in the settler;" that "upon the entry the right in favor of the settler would seem to attach to the land, which is liable to be defeated only by failure on his part to comply with the requirements of the homestead law in regard to settlement and cultivation. This right amounts to an equitable interest in the land, subject to the future performance by the settler of certain conditions (in the event of which he becomes invested with full and complete ownership); and until forfeited by failure to perform the conditions, it must prevail not only against individuals, but against the government." 1 Land Dec. 30. And many rulings of the Interior Department sustain this view. These official utterances are entitled to great respect at the hands of this court, as remarked by Mr. Justice Lamar in *Hastings & Dakota Railroad Co.* v. *Whitney*, 132 U. S. 357, 366.

In *Witherspoon* v. *Duncan*, 4 Wall. 210, 218, it is said by Mr. Justice Davis, speaking for the court, that "in no just sense can lands be said to be public lands after they have been entered at the land office and a certificate of entry obtained. If public lands before the entry, after it they are private property. . . . The contract of purchase is complete when the certificate of entry is executed and delivered, and thereafter the land ceases to be a part of the public domain. The government agrees to make proper conveyance as soon as it can, and in the meantime holds the naked legal fee in trust for the

purchaser who has the equitable title." It may be said that this language refers to the certificate issued on final proofs, but if the word " entry," as applied to appropriations of land, "means that act by which an individual acquires an inceptive right to a portion of the unappropriated soil of the country, by filing his claim," *Chotard* v. *Pope*, 12 Wheat. 586, 588, the principle has a wider scope.

In *Hastings & Dakota Railroad Co.* v. *Whitney, ubi supra,* an affidavit for the purpose of entering land as a homestead was filed on behalf of one Turner, in a local land office in Minnesota, on May 8, 1865, Turner claiming to act under section 1 of the act of March 21, 1864, 13 Stat. 35, c. 38, now section 2293 of the Revised Statutes of the United States. As a matter of fact, Turner was never on the land, and no member of his family was then residing, or ever did reside on it, and no improvements whatever had ever been made thereon by any one. Upon being paid their fees, the register and receiver of the land office allowed the entry, and the same stood upon the records of the local land office, and upon the records of the General Land Office, uncancelled, until September 30, 1872. Between May, 1865, and September, 1872, Congress made a grant to the State of Minnesota for the purpose of aiding in the construction of a railroad from Hastings, through certain counties, to a point on the western boundary of the State, which grant was accepted by the legislature of the State of Minnesota, and transferred to the Hastings and Dakota Railroad Company, which shortly thereafter definitely located its line of road by filing its map in the office of the Commissioner of the General Land Office. All these proceedings occurred prior to the 30th of September, 1872. This court declared that the almost uniform practice of the department has been to regard land upon which an entry of record, valid upon its face, has been made, as appropriated and withdrawn from subsequent homestead entry, preëmption, settlement, sale or grant, until the original entry be cancelled or be declared forfeited, in which case the land reverts to the government as part of the public domain, and becomes again subject to entry under the land laws; and it was held that whatever defects there might be in

an entry, so long as it remained a subsisting entry of record, whose legality had been passed upon by the land authorities and their action remained unreversed, it was such an appropriation of the tract as segregated it from the public domain, and, therefore, precluded it from subsequent grant; and that this entry on behalf of Turner "attached to the land" in question, within the meaning of the act of Congress making the grant, 14 Stat. 87, c. 168, and could not be included within it. And as to mere settlement with the intention of obtaining title under the preëmption laws, while it has been held that no vested right in the land as against the United States is acquired until all the prerequisites for the acquisition of title have been complied with, yet rights in parties as against each other were fully recognized as existing, based upon priority in the initiatory steps, when followed up to a patent. "The patent which is afterwards issued relates back to the date of the initiatory act, and cuts off all intervening claimants." *Shepley* v. *Cowan*, 91 U. S. 330, 337.

Section 2339 of the Revised Statutes, which is in substance the ninth section of the act of Congress of July 26, 1866, 14 Stat. 253, c. 262, provides : "Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed." This section, said Mr. Justice Miller, in *Broder* v. *Water Co.*, 101 U. S. 274, 276, "was rather a voluntary *recognition of a preëxisting right of possession*, constituting a valid claim to its continued use, than the establishment of a new one."

By section 17 of the act of July 9, 1870, amendatory of the act of July 26, 1866, it was provided, among other things, that "all patents granted, or preëmption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such

water rights, as may have been acquired under or recognized by the ninth section of the act of which this act is amendatory." 16 Stat. 218, c. 235, § 17. And this was carried forward into section 2340 of the Revised Statutes, and Smith's patent was subject to that reservation.

The 9th section of the act 1866 is referred to by Mr. Justice Field in *Atchison* v. *Peterson*, 20 Wall. 507, 512, and in the opinion it is said that "the government being the sole proprietor of all the public lands, whether bordering on streams or otherwise, there was no occasion for the application of the common law doctrine of riparian proprietorship with respect to the waters of those streams."

When, however, the government ceases to be the sole proprietor, the right of the riparian owner attaches, and cannot be subsequently invaded. As the riparian owner has the right to have the water flow *ut currere solebat,* undiminished except by reasonable consumption of upper proprietors, and no subsequent attempt to take the water only can override the prior appropriation of both land and water, it would seem reasonable that lawful riparian occupancy with intent to appropriate the land should have the same effect.

The Dakota Civil Code contains this section:

"Sec. 255. The owner of the land owns water standing thereon, or flowing over or under its surface, but not forming a definite stream. Water running in a definite stream, formed by nature over or under the surface, may be used by him as long as it remains there; but he may not prevent the natural flow of the stream, or of the natural spring from which it commences its definite course, nor pursue nor pollute the same." Levisee's Dakota Codes, 2d ed. 781.

By section 527, which is section 1 of an act relating to water rights, passed in February, 1881, Sess. Law, 1881, c. 142, § 1, it is provided: "That any person or persons, corporation or company, who may have or hold a title or possessory right or title to any mineral or agricultural lands within the limits of this Territory, shall be entitled to the usual enjoyment of the waters of the streams or creeks in said Territory for mining, milling, agricultural or domestic purposes: *Provided,* That

the right to such use shall not interfere with any prior right or claim to such waters when the law has been complied with in doing the necessary work." Levisee's Codes, 861.

Section 650 of the Code of Civil Procedure is as follows:

"Any person settled upon the public lands belonging to the United States, on which settlement is not expressly prohibited by Congress, or some department of the general government, may maintain an action for any injuries done the same; also an action to recover the possession thereof, in the same manner as if he possessed a fee simple title to said lands." Levisee's Codes, 171.

The local custom is set forth in the findings to have consisted in the recognition and acknowledgment of "the right to locate water rights, and to divert, appropriate and use the waters of flowing streams for purposes of irrigation when such location, diversion and use does not conflict or interfere with rights vested and accrued prior thereto."

Thus, under the laws of Congress and the Territory, and under the applicable custom, priority of possession gave priority of right. The question is not as to the extent of Smith's interest in the homestead as against the government, but whether as against Sturr his lawful occupancy under settlement and entry was not a prior appropriation which Sturr could not displace. We have no doubt it was, and agree with the brief and comprehensive opinion of the Supreme Court to that effect.

*The judgment is affirmed.*

Mr. Justice Brewer was not a member of the court when this case was submitted, and took no part in its decision.